# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Inotiv, Inc., *et al.*[1] | Case No. 26-90601 (CML) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION CLAIMS OF TRADE CREDITORS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY STATUS OF DEBTORS' UNDISPUTED OBLIGATIONS FOR POSTPETITION DELIVERY OF GOODS AND SERVICES, (III) AUTHORIZING THE DEBTORS TO CONTINUE CUSTOMER DEPOSIT AND ADVANCE BILLING PROGRAMS AND TO REFUND CUSTOMER DEPOSITS, (IV) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND FUND TRANSFERS, AND (V) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 9:00 a.m. (prevailing Central Time) on June 4, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 4, 2026, at 9:00 a.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Inotiv LAMS West Inc. (7130); Inotiv, Inc. (5024); BAS Evansville, Inc. (3157); BASi Gaithersburg, LLC (9967); Bronco Research Services, LLC (2654); Envigo Bioproducts, Inc. (2644); Envigo Global Services Inc. (6521); Envigo Holding I, Inc. (3754); Envigo New Holdco, LLC (9828); Envigo RMS B.V., Inc. (8162); Envigo RMS, LLC (3840); ERPP, Inc. (2545); Histion, LLC (2199); Inotiv Boulder, LLC (9567); Inotiv Nashville LLC (8480); Inotiv Research Models, LLC (6700); Integrated Laboratory Systems, LLC (3696); Precisium Solutions, LLC (2043); Seventh Wave Laboratories, LLC (3138). The Debtors' service address is 2701 Kent Avenue, West Lafayette, IN 47906.

> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Inotiv, Inc. and its affiliated debtors and debtors in possession (each a "***Debtor***" and collectively, the "***Debtors***") in the above-captioned chapter 11 cases, by and through undersigned proposed counsel, hereby submit this motion (the "***Motion***") for entry of an order granting the relief described below.  In support hereof, the Debtors rely on the *Declaration of Beth A. Taylor, Chief Financial Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***")[2] filed concurrently herewith, and further represent as follows:

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of an order (the "***Proposed Order***"), substantially in the form attached hereto:

(a)      authorizing, but not directing, the Debtors to pay, in the ordinary course of business and consistent with the DIP Orders (as defined in the Plan), certain undisputed prepetition claims for goods and services (collectively, the "***Trade Claims***") owed to certain trade creditors and lienholders (collectively, the "***Trade Creditors***"), including, but not limited to, Model Procurement and Care Vendors, Medical Supplies and Consumables Vendors, Lienholders, and Other Trade Creditors (each as defined below);

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

(b)     confirming the administrative expense priority status and authorizing payment in the ordinary course of business of the Debtors' undisputed obligations for the postpetition delivery of goods and provision of services;

(c)     authorizing the Debtors to continue their customer deposit and advance billing programs (as further described below) in the ordinary course of business, including applying customer deposits and advances against billings and refunding customer deposits upon request;

(d)     authorizing financial institutions to receive, honor, process, and pay all related checks issued or to be issued and fund transfers requested or to be requested on account of any obligations authorized to be paid pursuant hereto; and

(e)     granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over these cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. § 1334.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other bases for the relief requested herein are sections 105(a), 362(d), 363(b), 503, 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

5.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

3

the Bankruptcy Code.  No request for the appointment of a trustee or an examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has yet been appointed in these chapter 11 cases.

6.      The Debtors are a contract research organization beginning operations in 1975 and headquartered in West Lafayette, Indiana.  The Debtors provide nonclinical and analytical drug discovery and development services and supply research models and related products to customers in the pharmaceutical, biotechnology, and medical device industries.

7.      Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**OVERVIEW OF TRADE CLAIMS**

8.      As further described in the First Day Declaration, through its Discovery and Safety Assessment segment ("*DSA*"), the Debtors provide nonclinical drug discovery and development services, including analytical chemistry, drug metabolism, pharmacokinetics, toxicology, pathology, and bioanalysis, to pharmaceutical, biotechnology, and medical device clients. Through its Research Models and Services segment ("*RMS*"), the Debtors supply a range of purpose-bred, research-quality laboratory animals ("*Research Models*"), including non-human primates ("*NHPs*"), as well as specialty diets, bedding, enrichment products, and related husbandry services.  The Debtors' operations require a continuous and reliable supply of live animals, laboratory materials, and specialized services, and any disruption to the Debtors' vendor relationships could immediately impair the Debtors' ability to care for existing animal colonies, fulfill ongoing study commitments, and deliver products and services to customers.

9.      The Debtors' day-to-day business is dependent upon the Debtors' access to various goods and services provided by the Trade Creditors.  The Debtors also maintain certain customer deposit and advance billing arrangements (as further described below) in connection with their DSA and RMS operations.  For the twelve (12) months before the Petition Date, the Debtors' average monthly payment to Trade Creditors (exclusive of the Customer Programs (as defined below)) was approximately $14 million.

10.     The Debtors estimate that, as of the Petition Date, approximately $20.2 million of undisputed Trade Claims (exclusive of Customer Programs (as defined below)) have accrued and are unpaid.  The following table summarizes the types of Trade Claims held by the Trade Creditors and provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date:

| Category | Description of Goods and Services Provided | Estimated Amount Outstanding as of Petition Date |
|---|---|---|
| Model Procurement and Care Vendors | Includes (i) source animals and breeding stock, (ii) specialty feed, diets, bedding, and enrichment materials, (iii) veterinary services and supplies, and (iv) cage, caging system, and husbandry equipment | $3,200,000 |
| Medical Supplies and Consumables Vendors | Medical, scientific, and laboratory supplies, reagents, and consumables required to conduct studies, perform analytical testing, and operate the Debtors' laboratory and vivarium facilities. | $3,900,000 |
| Lienholders | Services necessary to transport, deliver, warehouse, and otherwise maintain goods, materials, or other property critical to the operation of the Debtors' businesses. | $4,200,000 |
| Professional Services | Claims on account of legal, accounting, audit, tax, consulting, and other corporate-support services provided to the Debtors in the ordinary course of business. | $4,700,000 |
| Other Trade Creditors | Other claims on account of general operations, non-laboratory supplies, subscriptions, technology, facilities, and other necessary or desirable goods and services related to the operation of the Debtors' businesses. | $4,200,000 |
| **Total Amount of Claims:** | | **$20,200,000** |

11.     The Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business and consistent with past practice, or as soon as reasonably practicable following entry of the Proposed Order, in each case in accordance with the DIP Orders.

The Debtors' liquidity as a result of the proposed DIP Facility will provide the Debtors with sufficient funding to pay the Trade Claims, and the Debtors' proposed budget[3] specifically contemplates such funding.

### A.    Vendors and Lienholders

12.    In the ordinary course of business, the Debtors engage certain suppliers and providers (the "*Vendors*") to provide various goods and services that are critical to the continued operation of the Debtors' businesses.  The Vendors fall into two principal categories:

(i)    *Model Procurement and Care Vendors*.  The Debtors depend on a network of suppliers (the "***Model Procurement and Care Vendors***") to provide source animals and breeding stock (including NHPs), specialty feed, diets, bedding, and enrichment materials, veterinary services and supplies, and cage, caging system, and husbandry equipment, all of which are critical to the operation of the Debtors' RMS and DSA segments.  The Debtors depend on these vendors to maintain the health and welfare of animal colonies across the Debtors' facilities, to source and import Research Models through pipelines that require significant lead times for procurement, quarantine, and veterinary screening, and to supply the inputs necessary for the Debtors to conduct studies and fulfill customer commitments.  Any interruption in the supply of these goods and services would immediately and directly impair the Debtors' ability to operate their business and could give rise to animal welfare concerns.

(ii)    *Medical Supplies and Consumables Vendors*.  In the ordinary course of operations, the Debtors purchase from certain vendors (the "***Medical Supplies and Consumables Vendors***") medical, scientific, and laboratory supplies, reagents, and consumables required to conduct studies, perform analytical testing, and operate the Debtors' laboratory and vivarium facilities.  These supplies are essential operational inputs without which the Debtors cannot perform the studies underlying their DSA revenue or maintain the laboratory conditions required by Good Laboratory Practice protocols and applicable regulatory standards.

---

[3]    Such proposed budget is attached as Exhibit 2 to the proposed order that the Debtors seek entry of pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors in Possession to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties and Prepetition PIK Notes Parties; (IV) Modifying the Automatic Stay: (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* filed contemporaneously herewith.

13.     In addition to the Vendors, the Debtors also depend on a network of common carriers, freight forwarders, transportation service providers, storage facilities, logistics providers, warehouses, and other similar parties that are able to assert liens under applicable law (collectively, the "*Lienholders*").  The Debtors depend on these Lienholders to, among other things, transport, deliver, warehouse, and otherwise maintain Research Models, laboratory supplies, and other goods and materials critical to the operation of the Debtors' businesses, including the timely delivery of Research Models (including NHPs) to customers and between the Debtors' facilities and distribution hubs.  Given the nature of the Debtors' business, which requires the shipment of live animals under time-sensitive and climate-controlled conditions, any refusal by a Lienholder to release animals or materials in its possession pending payment could result not only in significant business disruption but also in immediate animal welfare concerns.

**B.     Other Trade Creditors**

14.     In the ordinary course of business, certain other creditors of the Debtors (the "*Other Trade Creditors*") provide goods and services that are essential to the Debtors' operations but are not included in the categories of claims described above.  Such claims likely are not entitled to administrative expense priority and likely do not entitle the Other Trade Creditors to assert and enforce liens against the Debtors' property.  The Other Trade Creditors fall into two principal categories:

> (i)     *Professional Services*.  The Debtors retain various professionals, utilized in the ordinary course of business and not otherwise retained pursuant to a separate order of the Court, to provide legal, accounting, audit, tax, consulting, regulatory compliance, and other corporate advisory services (collectively, "*Professional Services*").  The Debtors' reliance on Professional Services is particularly significant given the complexity of the Company's operations across 22 sites in four countries, the highly regulated nature of the CRO and preclinical research industry, and the Debtors' ongoing operational initiatives to streamline and optimize their business. As of the Petition Date, the Debtors estimate that approximately $4.7 million

in claims on account of Professional Services remains outstanding. The Debtors seek authority to pay these claims in the ordinary course of business

(ii)     *General Operations and Other Services*.   The remaining Other Trade Creditors provide a wide range of goods and services necessary for the continuation of the Debtors' operations, including, without limitation, general operations support, non-laboratory supplies, subscriptions, technology and information systems, facilities maintenance and repair, and other goods and services, including those provided by non-U.S. vendors.

## C.     Customer Programs

15.     Consistent with industry practice in the contract research services sector, the Debtors maintain two categories of customer-facing arrangements that involve the receipt and application of customer funds: (a) advanced and milestone billing arrangements in connection with DSA studies (the "***DSA Advance Billing Arrangements***"), and (b) upfront cash deposits received from RMS clients (the "***RMS Client Deposits***," and together with the DSA Advance Billing Arrangements, the "***Customer Programs***").

16.     Under the DSA Advance Billing Arrangements, the Debtors typically bill their DSA studies on a milestone or installment basis.  Customers ordinarily remit an initial deposit upon study initiation, generally ranging from approximately 10% to 50% of total study cost, with the balance invoiced upon achievement of specified study milestones.  This results in deferred revenue, as the Debtors have received partial payment on account of future performance under these arrangements.  These advances are intended to cover the Debtors' initial investment in model procurement, protocol development, and other study setup costs, and to secure the customer's reserved capacity within the Debtors' facilities.  As of the Petition Date, the Debtors estimate the aggregate balance on account of DSA Advance Billing Arrangements to be approximately $23 million, which has historically ranged from $20 million to $25 million at the close of any given period.  The Debtors seek authority to continue applying these prepayments in the ordinary course of business as study milestones are achieved and services are rendered.

17.     In the ordinary course, the Debtors' RMS segment receives upfront cash deposits from clients in connection with orders for Research Models, including NHPs, purpose-bred large research models, custom-bred rodent models, and other specialized research model supply commitments.  The RMS Client Deposits are required by the Debtors to (i) reserve the client's place in the Debtors' production, breeding, and sourcing pipelines, and (ii) fund the Debtors' front-loaded sourcing, importation, quarantine, veterinary screening, and husbandry costs associated with Research Model supply.  As of the Petition Date, the Debtors hold approximately $18 million in RMS Client Deposits.  In the ordinary course, the Debtors apply up to approximately $1 million of funds held on deposit against customer billings each month.

18.     The Debtors seek authority to (a) continue applying RMS Client Deposits against customer billings in the ordinary course of business, and (b) refund RMS Client Deposits in the ordinary course of business upon customer request.  Together with the authority sought with respect to the DSA Advance Billing Arrangements described above, the foregoing constitutes the relief sought by the Debtors with respect to the Customer Programs.  Continued administration of the Customer Programs is consistent with the Debtors' prepetition practices and is necessary to preserve the Debtors' relationships with their pharmaceutical and biotechnology clients.  These relationships are characterized by long lead times, significant upfront investment by both parties, and high switching costs.  Failure to honor the Customer Programs could cause customers to lose confidence in the Debtors' ability to perform, jeopardize the Debtors' DSA and RMS revenue streams, and diminish the value of the Debtors' estates.

19.     Although the Debtors believe that the continued administration of the Customer Programs, including the application of deposits and advances against customer billings and the refunding of RMS Client Deposits upon customer request, constitutes an ordinary course

transaction, the Debtors request, out of an abundance of caution, that the Court authorize the Debtors to continue administering the Customer Programs postpetition, as continued business from these customers is a contributing factor to the Debtors' future success.  No party in interest will be prejudiced by the relief requested herein because, to the extent any customer holds a Claim on account of the Customer Programs, such Claim is unimpaired under the Plan.  Accordingly, the relief requested herein seeks to alter only the timing, not the amount or priority, of the Debtors' obligations under the Customer Programs.

20.     Based upon the foregoing, the Debtors submit that the continuation of the Customer Programs and the authorization to refund RMS Client Deposits upon customer request is essential to the Debtors' ongoing operations, the preservation of customer confidence, and the maximization of the value of the Debtors' estates for the benefit of all stakeholders

## TREATMENT OF TRADE CLAIMS UNDER THE PLAN

21.     The Debtors filed these chapter 11 cases to consummate a prepacked plan of reorganization (the "*Plan*") that deleverages the Company's balance sheet while preserving the estates' going-concern value for the benefit of all stakeholders.  Under the Plan, all General Unsecured Claims, including the Trade Claims, will be reinstated or otherwise unimpaired, and the only classes receiving less than full recovery under the Plan are certain lender and noteholder classes, each of which has already overwhelmingly voted to accept the Plan.  The primary recovery for those impaired classes consists of equity interests in the reorganized Company, whose value depends directly on the Debtors' continued operations and commercial relationships.  Paying Trade Creditors in the ordinary course during the pendency of these chapter 11 cases preserves the Debtors' commercial relationships and going-concern value.  Accordingly, the relief requested in

this Motion furthers the Debtors' goals to maximize recoveries for all creditors, all in accordance with the Plan.

22.     Furthermore, the Plan contemplates that substantially all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired by their own terms on or before the effective date of the Plan, will be assumed under (and in accordance with) the terms of the Plan.  Any outstanding amounts owed under any assumed executory contract or unexpired lease will be paid or otherwise "cured" pursuant to section 365(b)(1) of the Bankruptcy Code in accordance with the terms of the Plan.  As such, payment of the Trade Claims in the ordinary course during the pendency of these chapter 11 cases is consistent with the Plan's treatment of the Debtors' commercial relationships and ensures that counterparties to the Debtors' assumed contracts continue to perform without interruption.

## BASIS FOR RELIEF

**A.     Payment of the Trade Claims is Warranted Under Sections 363(b)(1) and 105(a) of the Bankruptcy Code.**

23.     A bankruptcy court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code.  11 U.S.C. § 363(b)(1).  Section 363(b)(1) authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1); s*ee also In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances.").  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons.  *See, e.g., In re BNP Petrol. Corp.*, 642 F. App'x 429, 434-35 (5th Cir. 2016) (*citing In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)) ("[F]or the debtor-in-possession or trustee to satisfy its

11

fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business").

24.     In addition, the Debtors submit that payment of the Trade Claims is necessary and appropriate and is authorized under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" doctrine, which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989). Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) (citation omitted) ("It is well settled that the court's power under § 105(a) is broad."); *In re Nortel Networks, Inc.*, 532 B.R. 494, 554 (Bankr. D. Del. 2015) (citations omitted) (interpreting section 105 of the Bankruptcy Code "to give bankruptcy courts 'broad authority' to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to 'craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.'").

25.     The Court's power to utilize the "doctrine of necessity" in these chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity more

than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309.

26.     The doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *see also In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment and approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Sharon Steel Corp.*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993) (noting that courts grant debtors the authority to pay certain prepetition claims "where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code"); *Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l v. Motor Coach Indus. Int'l (In re Motor Coach Indus. Int'l)*, Case No. 09-078-SLR, 2009 WL 330993, at *2 n.5 (D. Del. Feb. 10, 2009); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994). The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims. The court in *In re StructureLite Plastics Corp.* indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section

105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *In re StructureLite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988). The court stated that a "*per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

27.     The Debtors submit that the relief requested in this Motion represents a sound exercise of the Debtors' business judgment; is within the Debtors' ordinary course of business; is necessary to avoid immediate and irreparable harm; is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders; and is justified under sections 363 and 105 of the Bankruptcy Code.  Indeed, the relief sought herein is amply justified by the need for the continued receipt of the goods and services that the Trade Creditors provide.  The Debtors operate in the highly specialized and competitive CRO and preclinical research industry, where the continuity of supply relationships is essential to the Debtors' ability to fulfill existing study obligations — including an active DSA backlog of approximately $151.8 million — maintain the health and welfare of animal colonies across the Debtors' facilities, and service their pharmaceutical and biotechnology clients, whose drug development timelines depend on the Debtors' uninterrupted performance.  The Debtors' supply chain for Research Models involves significant lead times for procurement, importation, quarantine, and veterinary screening, and alternative sources of supply cannot readily be established given the barriers to entry in the Research Model industry.  The Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in the Trade Creditors refusing to provide essential goods and

14

services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms. A Trade Creditor's nonperformance could materially disrupt the Debtors' operations and jeopardize the continued viability of the Debtors' businesses as well as their restructuring efforts. Furthermore, the Debtors believe that the uninterrupted supply of goods and services and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.

28. Additionally, the Debtors believe that payment of Trade Claims will be necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with all Trade Creditors, and maximize the value of the Debtors' assets for the benefit of all stakeholders. Authority to pay the Trade Claims as they come due will assist the smooth transition into and out of these prepackaged chapter 11 cases and will ensure the Debtors' continued operation during the intervening period.

29. In light of the foregoing, payment of the Trade Claims as provided herein, is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, is in the best interests of the Debtors' estates and their creditors, and is warranted under the circumstances.

**B.      Certain Trade Creditors May be Entitled to Assert Statutory Liens.**

30. The Debtors believe that their failure to pay the Lienholders may result in the assertion of possessory liens by many of the Lienholders under applicable state law with respect to certain of the Debtors' property, including Research Models and NHPs in transit (collectively, the "*Liens*"). States in which the Debtors operate may protect the rights of Lienholders by granting them statutory liens to secure payment for their services. Given the unique nature of the Debtors' business, which involves the transportation of live animals under time-sensitive and climate-controlled conditions, any assertion of possessory liens could have particularly severe

15

consequences — not only could it disrupt the Debtors' supply chain and impair their ability to fulfill customer orders, but it could also raise immediate animal welfare concerns if animals are held by carriers pending resolution of payment disputes. Pursuant to section 362(b)(3) of the Bankruptcy Code, acts to perfect such Liens or interests, to the extent consistent with section 546(b) of the Bankruptcy Code, are expressly excluded from the automatic stay otherwise established by section 362(a) of the Bankruptcy Code. Moreover, under section 546(b), a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." Therefore, notwithstanding the automatic stay established by section 362 of the Bankruptcy Code, many of the Lienholders may assert and perfect Liens or interests against the Debtors' property. Thus, they would hold secured claims under section 506(b) of the Bankruptcy Code that would, in any event, be required to be paid in full under section 1129(b)(2)(A) of the Bankruptcy Code. Moreover, to protect any asserted Lien rights, such counterparties may refuse to release goods or property in their possession unless and until their prepetition Trade Claims have been satisfied. Therefore, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, many of these parties: (a) may be entitled to assert and perfect Liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors in any event; and (b) may hold the property subject to the asserted Liens pending payment, to the direct detriment of the Debtors and their estates. The time and resources that would be required for the Debtors to contest Liens would detract from the value of the estate and could impair the Debtors' ability to stabilize their operations.

**C.      Certain Trade Claims May Have Administrative Expense Priority.**

31.      Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a

16

case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.  Additionally, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.  The Debtors believe that, as of the Petition Date, they owe approximately $4.0 million on account of goods delivered within the 20 days prior to the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

32.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation.  As these claims are administrative claims incurred in the ordinary course of business, the Debtors believe that they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See*, *e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

33.     The Debtors' ongoing ability to timely obtain goods is key to their survival and necessary to preserve the value of their estates.  Absent payment of certain of the Trade Claims at the outset of these chapter 11 cases — which merely accelerates the timing of payment and not the ultimate treatment of such claims — the Debtors could be denied access to the source animals, laboratory supplies, and other goods critical to the Debtors' ongoing study commitments and animal care obligations.  Failure to honor these claims in the ordinary course of business may also

17

cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process. Such vendors could accelerate or eliminate favorable trade terms. Needless to say, such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

**D.    No Party Will Be Prejudiced by the Relief Requested in the Motion**

34.    No party in interest will be prejudiced by the relief requested in this Motion. The Trade Claims are unimpaired under the Plan and will be paid in full, and the impaired classes — whose primary recovery consists of equity interests in the reorganized Company — have already overwhelmingly voted to accept the Plan. Accordingly, the relief requested in this Motion only alters the timing of payments, not the entitlement or priority of any creditor. Authority to pay the Trade Claims in the ordinary course is necessary to avoid the risk of key vendors and service providers withholding essential goods and services, which would diminish the value of the Debtors' business that the Plan is designed to maximize for the benefit of all the Debtors' stakeholders.

**E.    Continuing to Honor the Customer Programs and Refunding Customer Deposits in the Ordinary Course is Warranted under Sections 363 and 105(a) of the Bankruptcy Code and Is in the Best Interests of the Debtors' Estates.**

*(i) Honoring the Customer Programs in the Ordinary Course of Business Is Authorized Under Section 363(c) of the Bankruptcy Code.*

35.    Section 363(c) allows a debtor-in-possession to enter into transactions involving property of the estate in the ordinary course of business without an order of the Court. *See, e.g., In re James A. Phillips, Inc.*, 29 B.R. 391, 395, n.2 (S.D.N.Y. 1983) ("Insofar as [the] transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a) and do not require Bankruptcy Court approval."). In similar circumstances, courts have recognized the need to allow debtors to treat prepetition customer deposits and prepayments for goods and

18

services as being in the ordinary course of business. *See, e.g., In re Federated Dep't Stores, Inc.* 1990 Bankr. LEXIS 102 (Bankr. S.D. Ohio Jan. 15, 1990) (authorizing debtors to treat deposits or prepayments on goods and services "in the same manner as Debtors treated Deposits prior to the commencement of the cases"). Here, the Debtors have administered the Customer Programs, including applying customer deposits and advances against billings as study milestones are achieved and services are rendered, as a standard billing practice in the ordinary course of their business for years. Consequently, the postpetition continuation of the Customer Programs in the ordinary course of business is permitted by sections 363(c), 1107(a), and 1108 of the Bankruptcy Code, without further application to the Court.

### (ii) The Court May Authorize the Debtors to Continue Honoring the Customer Programs and to Refund Customer Deposits as a Sound Exercise of Their Business Judgment Pursuant to Section 363(b) of the Bankruptcy Code.

36. Out of an abundance of caution, the Debtors additionally request the relief described in this Motion pursuant to Section 363(b) of the Bankruptcy Code as a sound exercise of their business judgment. The Debtors reconcile and honor the Customer Programs, including the application of deposits and advances against billings and the refunding of customer deposits upon request, in the ordinary course of business and, therefore, the relief requested herein does not require further Court order pursuant to section 363(c)(1) of the Bankruptcy Code. 11 U.S.C. § 363(c)(1). To the extent the Court determines that the requested relief is outside the ordinary course of business, the Court may grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.,*

19

*Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); see also *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A bankruptcy judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

37.     Courts emphasize that the business judgment standard is not an onerous standard; rather it "is flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Perez*, 339 B.R. 385, 399 n.14 (Bankr. S.D. Tex. 2006), *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with substantial freedom to tailor his orders to meet differing circumstances and to avoid shackling the judge with unnecessary rigid rules.") (cleaned up). As such, courts exhibit "[g]reat judicial deference . . . to [a debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005). Indeed, as long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly

20

erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (cleaned up).

38.     The relief requested by this Motion with respect to the Customer Programs represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  The failure to honor the Customer Programs, including the failure to apply customer deposits and advances against billings or to refund deposits when requested, would have a material adverse impact on the day-to-day operations of the Debtors' businesses and cause an irreparable loss of customer support and confidence.  The Debtors' customer relationships in the CRO and Research Model industries are characterized by long lead times, significant upfront investment by both parties, and high switching costs.  If the Debtors could not continue honoring the Customer Programs, the Debtors would risk alienating key customers, who could terminate their arrangements with the Debtors and seek the services of competing CROs.  This would damage the Debtors' market position and ability to generate future revenue.  Thus, the potential consequences of failing to honor the Customer Programs in the ordinary course far outweigh the costs of continuing these practices during these chapter 11 cases. The relief requested herein will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to maximize value for their estates.

39.     With respect to the refund of RMS Client Deposits specifically, the Debtors' vendor agreements with certain of their largest customers contemplate the return of deposits under specified circumstances, including upon termination of the applicable agreement.  In the ordinary course of the Debtors' business, customers may request refunds of their deposits in connection with order cancellations, changes in project scope, or other circumstances, and the Debtors have historically honored such refund requests as they arise.  Although the Debtors believe that

21

continuing to honor refund requests constitutes an ordinary course transaction, the Debtors request, out of an abundance of caution, that the Court authorize the Debtors to continue refunding RMS Client Deposits postpetition, as continued business from these customers is a contributing factor to the Debtors' future success. Absent authority to refund deposits, the Debtors risk jeopardizing valuable ongoing business relationships that are integral to the Debtors' RMS revenue stream.

> ***(iii) The Court May Authorize the Debtors to Continue to Honor the Customer Programs and to Refund Customer Deposits as Necessary to Their Continued Operation Pursuant to Section 105(a) of the Bankruptcy Code.***

40. Finally, the Debtors submit that the continued administration of the Customer Programs and the refunding of RMS Client Deposits upon customer request is necessary and appropriate and, therefore, may be authorized by this Court under section 105(a) of the Bankruptcy Code, pursuant to the "doctrine of necessity," as described in more detail above. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491–93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56.

41. Here, the Debtors' ability to maintain and honor the Customer Programs, including the refunding of RMS Client Deposits upon customer request, is critical to the ongoing operation of the Debtors' business and therefore necessary to the Debtors' successful reorganization. The ability to continue honoring the Customer Programs without interruption is critical to the Debtors'

valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders by maximizing the value of the Debtors' estates. The failure to honor the Customer Programs could have a material adverse impact on the day-to-day operations of the Debtors' businesses and cause an irreparable loss of customer support and confidence, thus potentially substantially diminishing the value of the Debtors' estates.

42. Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders. Absent this relief, the value of the Debtors' estates would suffer, possibly precipitously. Consequently, the Debtors' stakeholders would benefit if the requested relief is granted.

**APPLICABLE FINANCIAL INSTITUTIONS SHOULD BE AUTHORIZED TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

43. The Debtors also request that all applicable financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by, the Debtors related to the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date and (b) rely on the Debtors' designation of any particular check as approved by the Proposed Order.

**EMERGENCY CONSIDERATION**

44. The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm. As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not

23

granted. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE**
**6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(h)**

45. With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14)-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors. Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the fourteen (14)-day stay under Bankruptcy Rule 6004(h).

**RESERVATION OF RIGHTS**

46. Nothing in this Motion is intended to be nor shall be deemed: (i) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (ii) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (iv) a waiver of the obligation of any party in interest to file a proof of claim; (v) a promise or requirement to pay any particular claim; (vi) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (vii) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (viii) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (ix) a request or authorization to assume, adopt, or reject any

agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

47.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the United States Attorney's Office for the Southern District of Texas; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors; (iv) the state attorneys general for all states in which the Debtors conduct business; (v) the Internal Revenue Service; (vi) the United States Securities and Exchange Commission; (vii) counsel to the First Lien Ad Hoc Group, Davis Polk & Wardwell LLP; (viii) counsel to the Ad Hoc Noteholder Group (as defined in the Plan), Paul, Weiss, Rifkind, Wharton & Garrison LLP; (ix) counsel to the DIP Lenders (as defined in the Plan); (x) the Trade Creditors; (xi) banks and financial institutions where the Debtors maintain accounts; (xii) the DOJ; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

48.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC at https://restructuring.ra.kroll.com/Inotiv.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  June 3, 2026
   Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Philip M. Guffy (Texas Bar No. 24113705)
Kaleb Bailey (Texas Bar No. 24136717)
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
Email:  taddavidson@hunton.com
   pguffy@hunton.com
   kbailey@hunton.com

**ROPES & GRAY LLP**
Cristine Pirro Schwarzman (*pro hac vice* admission pending)
Daniel I. Forman (*pro hac vice* admission pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email:  cristine.schwarzman@ropesgray.com
   dan.forman@ropesgray.com

*Proposed Co-Counsel to the Debtors in Possession*

26

## CERTIFICATE OF SERVICE

I certify that on June 3, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II